IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CLAUDETTE M. MILES, et al.        :        CIVIL ACTION
                                  :
        v.                        :
                                  :
LANSDOWNE BOROUGH, et al.         :        NO. 11-1913

MEMORANDUM

Bartle, J.                                November 29, 2012

        Plaintiffs Claudette M. Miles ("Miles") and Women of
War Ministries (the "Ministry") bring this action for violation
of their civil rights under 42 U.S.C. § 1983[1] and the Religious
Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42
U.S.C. § 2000cc, against defendants Lansdowne Borough, John P.
Gould ("Gould"), Mike Jozwiak ("Jozwiak"), Daniel J. Kortan, Jr.
("Kortan") and Delaware County.[2]  Specifically, plaintiffs claim
under § 1983 that Miles was incarcerated without due process and
held personally liable for debts and fines which should have been
imposed upon the Ministry.  Plaintiffs further aver that their
inability to use their property for religious purposes violated
RLUIPA.  Included in the Second Amended Complaint are

_____

1.   The Second Amended Complaint alleges claims under 42 U.S.C.
§ 1981, but the plaintiffs stipulated that any § 1981 claim in
the Second Amended Complaint was a typographical error meant to
read § 1983.

2.  Plaintiff also originally sued the Honorable John J. Perfetti
but later stipulated to his dismissal from the action.

supplemental state law claims for abuse of process, malicious prosecution, and false arrest.

Before the court are two motions for summary judgment, one by defendants Lansdowne Borough, Gould, Jozwiak, and Kortan and the other by defendant Delaware County.

I.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or ... showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c).

A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Summary judgment is granted where there is insufficient record evidence for a reasonable jury to find for the plaintiffs. Id. at 252. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  We view the facts and draw all inferences in favor of the non-moving party.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).  When ruling on a motion for summary judgment, we may only rely on admissible evidence.  See, e.g., Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999).

II.

The following facts are undisputed or viewed in the light most favorable to the plaintiffs as the nonmoving parties. Miles is the founder and executive director of the Ministry, a nonprofit religious corporation established in 1999 and located in Lansdowne, Pennsylvania.  She has also been identified as president of the Ministry on its tax returns.  The Ministry is composed of members who make its decisions and perform its duties.  The Ministry owns three properties in Lansdowne Borough: 22 South Highland Avenue, 24 South Highland Avenue, and 50 East Baltimore Avenue.  Miles has also been the Pastor of the Children's Bread Church since its inception in approximately 2002.  The Children's Bread Church rents the property at 22 South Highland Avenue from the Ministry.  Miles resides in Philadelphia.  Her address was provided as the Ministry's address on some forms.

In 2004, after the sale of the 50 East Baltimore Property to the Ministry, Miles presented herself to the Borough as the "Equitable Owner or Lessee" of this vacant commercial

-3-

property.  Plaintiffs intended to use 50 East Baltimore Avenue as
a church but were not able to do so.  Linda Postell, a member of
the Ministry, testified that she attended a zoning appeal board
hearing apparently sometime in 2004 where the Ministry's zoning
permit application was denied.  According to Postell, "it was our
opinion it was because there was going to be a church in the
building and they had restricted any other churches from coming
into the area."  Mia L. McMillan, another Ministry member,
similarly testified, "[a]t the zoning board, they said they
didn't want another church in the area.... They decided they had
had enough churches.  They didn't want any other churches."
Miles stated at her deposition that Steven Travers ("Travers"),
zoning officer for the Borough, told her that if the Ministry was
going to conduct religious activities of any kind at the
property, it would be in violation of the Borough's zoning code.
During discovery Travers explained that 50 East Baltimore Avenue
was in a "C-2 district," which meant the property was prohibited
from being used as a "church, synagogue, mosque and other houses
of worship."  Whether Miles or the Ministry appealed the zoning
board's decision or applied for a variance following the meeting
is not in the record.

        Beginning sometime in 2007, the Borough served on Miles
a number of citations for property violations occurring at the
three Ministry properties, although mainly at 50 East Baltimore
Avenue.  In total, there were 28 code enforcement citations
issued against Miles personally, resulting in $28,448.85 in fines

-4-

against her, and six against the Ministry, resulting in $2,093.62 in fines against it. Defendants Gould and Jozwiak were code enforcement offers who were involved in Miles' code citations. Gould was the Borough's senior code enforcement officer and Jozwiak was the Borough's director of zoning and code enforcement.

Notice of building code violations for the 50 East Baltimore Avenue property was posted on the property, hand delivered to Miles and other members of the Ministry, and mailed to Miles' home in Philadelphia which, as noted above, was also the listed place of business for the Ministry. It was written on the reverse side of these notices that failure to make the necessary corrections or schedule a reinspection of the property may result in legal action by the Borough. The notices also provided that each day a violation existed was considered a separate violation. Following this policy, Jozwiak and Gould sometimes served Miles with citations for the same violation when it had not been remedied in 24 hours.

In addition to Miles and the Ministry, Jozwiak and Gould issued multiple citations on one other individual, not associated with this lawsuit or the parties, for failure to remedy a violation. In that instance, the building was a residential building at 260 North Wycombe Avenue with 30 to 40 units, owned by an individual named Fred Farbman. The violations included issues with fire exit signs and emergency lighting which affected the safety of the tenants. Jozwiak recalled issuing 64

citations in total for that property in 2008.  No warrant was
ever issued against Farbman, and he was never arrested.  Farbman
and the Borough came to an agreement "with regards to compliance
within a certain amount of time and some of the citations would
be dropped."  Ultimately, 50% of the citations against Farbman
were dismissed.  No other instance of issuing citations every day
occurred for a vacant property other than the Ministry's
property.

   Members of the Ministry were aware of the citation
notices, either because they saw them on the property, heard
about them at meetings, or were told about them by Miles.  Later
notices for the building code violations were issued to provide
dates for hearings concerning the violations.  In additions,
summons notices were sent to Miles.[3]  The summons notices stated,
"[i]f you fail to respond to this summons within the time
specified above, a warrant for your arrest shall be issued."  One
of these notices was sent by certified mail and signed as
received by Miles.  She did not respond.

   A number of the citations were for failure to obtain a
use and occupancy certificate under § 157-1 of the Code of
Lansdowne Borough ("Code"), which provides:

> Except as provided herein, no owner or
> possessor of any real property, land,
> buildings or structures within the Borough of

---

3.  It is not clear from the record how many summons notices were
sent to Miles.  Two are attached in an exhibit, both dated
August 24, 2007, for two different violations of the Borough
code, for failure to obtain a use and occupancy certificate.

> Lansdowne shall deed, convey or transfer
> title to such real property, land, buildings
> or structures within the Borough of
> Lansdowne; change any existing use of any
> real property, building or structures within
> the Borough of Lansdowne; occupy or use any
> enlargement of any structure or building or
> occupy or use any newly erected building or
> structure within the Borough of Lansdowne; or
> occupy or use any vacant ground in the
> Borough of Lansdowne unless and until such
> owner or possessor shall have applied for and
> been issued a certificate of occupancy by the
> Borough of Lansdowne.

This section was adopted by the Borough in 1982. There had been no previous requirement to have a certificate of occupancy. Robert and Charles Barksdale owned the property at 50 East Baltimore Avenue from 1972 until they sold it to the Ministry at auction in 2004. Because they bought the property prior to the enactment of § 157, they were not required to obtain a certificate of occupancy. Robert Barksdale recalls selling the property in "as is" condition. Steven Travers, a zoning officer for the Borough, recalls that he told the auctioneer who performed the sale of the property that the new owner would need to apply for a certificate of occupancy.

In November 2004, around the time of the sale of 50 East Baltimore Avenue, Gould performed an inspection of the property and wrote to the Ministry that various property code violations needed to be remedied before a certificate of occupancy could be issued. On June 25, 2007, Travers wrote to the Ministry that a violation at the Baltimore Avenue property existed in that "[a] first inspection was completed and the

property transferred ownership without a final inspection and a Use and Occupancy Certificate was not issued."  A final inspection was needed to determine that the various property code violations were remedied.

On October 21, 2008, the Ministry applied for a permit to convert the garage on the Baltimore Avenue property into a retail produce store.  The Borough granted the application on October 27, 2008 but revoked the approval on December 19, 2008. On December 19, 2008, Jozwiak sent Miles a letter stating that it had come to his attention that "a Certificate of Use and Occupancy was never obtained from the Borough relating to the sale and purchase of this building [50 East Baltimore Avenue] in 2004" and that Miles could not "obtain a Zoning permit without a Certificate of Use and Occupancy required during the transfer of ownership and property."  The letter went on to say, "[o]nce a Certificate of Use and Occupancy for the issue for the entire building [sic] from 2004 has been resolved along with other various code concerns, I will be more than happy to re-issue this zoning permit for use."  According to Miles, she never received this letter and was never told why Jozwiak revoked the approval of her application.

Jozwiak also inspected the Ministry's other properties, at 22 and 24 South Highland Avenue.  He issued citations against Miles with regard to those two properties in 2008 and 2009 for exterior maintenance issues, such as broken and missing gutters and a boarded up front of the building.

Some of the property code citations issued against Miles and the Ministry were for problems with the roof at 50 East Baltimore Avenue. This damage to the roof also had to be repaired before a use and occupancy certificate could be issued.

The Ministry, led by Miles, attempted to hire two roofing companies to perform the necessary repairs. First, it engaged Summerfield Roofing, operated by Paul Summerfield. Miles was the only contact from the Ministry for Summerfield Roofing. At some point, Summerfield ceased doing work. Plaintiffs aver that Summerfield was intimidated by the defendants to leave the job. The only evidence of this on the record is Miles' testimony in her deposition that code enforcement office agents observed the work Summerfield was doing on the property, said they were not satisfied that he could do the job, and stopped his work. In contrast, Paul Summerfield testified that the Ministry did not pay his company on time and did not supply the necessary materials for the project. This led to his own decision to stop the work.

In July 2010, the Ministry then hired a new roofing contractor, Cooper Roofing, led by Terry Cooper, which provided an estimate that the project would cost $37,500. Miles was also the main Ministry contact for Cooper Roofing. Around the same time, on July 4, 2010, Gould sent Miles a letter saying that the Code Department received a roofing estimate for the Baltimore Avenue Property from Reiter Roofing in the amount of $125,000. The Ministry accepted the proposal from Cooper Roofing on

July 13, 2010.  Cooper Roofing never completed the repairs to the
roof.  The plaintiffs allege that the defendants somehow
prevented Cooper Roofing from doing its work.  However, Terry
Cooper testified that he did not believe that the Borough ever
prevented his company from performing any work on the roof but
rather believed that his company did not perform any work on the
roof because his company did not receive assurances that it would
be paid.

By March 20, 2009, Miles had twenty-one outstanding
code enforcement citations for the property violations at the
three Ministry properties.  Bench warrants had been issued
against Miles for three of the twenty-one, and another three
bench warrants had been issued against Miles for parking tickets.
All six bench warrants were issued in 2007 and 2008 by
Magisterial District Judge John J. Perfetti.  One of the bench
warrants for property code citations was for failure to pay a
fine under § 294-1 of the Code, regarding snow and ice removal,
and the other two were for failure to respond to citations
regarding the requirement of a use and occupancy certificate
under § 157-1 of the Code.

Miles went to the Municipal Building in the Borough on
March 20, 2009 to meet Jozwiak and Gould to discuss an
application for the Ministry to continue work on its property at
50 East Baltimore Avenue.  Kortan, the chief of the police
department, dispatched patrol officer Marc Mugler ("Mugler") to
the Municipal Building to arrest Miles.  Kortan explained to

Mugler that Miles had outstanding bench warrants for traffic and code issues with the Borough. Miles was handcuffed, placed into custody, and taken before Magisterial District Judge Christopher J. Mattox. At the hearing, all twenty-one of the property code citations were submitted to Judge Mattox for consideration in establishing collateral, that is, bail. The judge did not hold a hearing on the merits. The record is silent as to whether Miles entered a plea at this hearing. With each of the twenty-one property code citations carrying a statutory fine of up to $1,000, the total potential fines were $21,000. Judge Mattox set bail at $2,000.

At the time of her arrest, Miles had over $300 in her possession. This would have been sufficient to pay the $82.50 collateral ($27.50 each) on the three warrants on parking tickets and the $150 collateral ($50 each) on the three warrants related to code citations. Miles was not offered the option of paying these smaller sums in lieu of the $2,000 bail. The bench warrants contained the following instructions:

> When the defendant is taken into custody,
> either (a) accept a signed guilty plea and
> the full amount of fines and costs, (b)
> accept a signed not guilty plea and the full
> amount of collateral, (c) accept the amount
> of restitution, fine, and costs due following
> a guilty plea or conviction, or (d) if unable
> to pay, promptly take defendant for a hearing
> on the bench warrant as provided in
> Pa.R.Crim.P. 431(c)(3).

Miles called a member of the Ministry to try to obtain the $2,000 bail but was unable to do so in the hour before the

court closed.  When she failed to secure the funds, she was brought back to the police headquarters and then transported by Delaware County constables to the George Hill Correctional Institution ("George Hill").  George Hill is located in Delaware County and operated by GEO, Inc., a private corporation, pursuance to a contract with the Delaware County Board of Prison Inspectors (the "Board").  Delaware County is not a signatory to that contract.  Miles was incarcerated at George Hill on March 20, 2009 and was not released until about 9:00 p.m. on March 23, 2009 after the Ministry posted the $2,000 bail.

Miles' experience at George Hill upset and disturbed her.  In particular, she was afraid of her fellow inmates and also stopped eating at some point during her stay as a result of this fear.  She also had some trouble obtaining medication for her diabetes, although the record is not clear as to what exactly occurred in this regard.  At some point following her arrest, Judge Perfetti found that Miles was not a proper party to be held responsible for the code violations and dismissed all the property code citations against her.

### III.

Delaware County has moved for summary judgment on the ground that it had no involvement with the citations, the bench warrants, and Miles' arrest.  It also argues that it does not

operate or manage the correctional facility in which Miles was incarcerated.[4]

The plaintiffs' claims against Delaware County are contained in two of the four counts of their Second Amended Complaint. In Count II, Miles avers that all the defendants, including Delaware County violated her due process rights under 42 U.S.C. § 1983 by holding her personally liable for debts and fines imposed by the defendants upon the Ministry. In Count IV, Miles alleges three supplemental state law claims for abuse of process, malicious prosecution, and false arrest by all the defendants, including Delaware County.

The plaintiffs have not alleged that Delaware County has any policy or practice that resulted in a deprivation of either of the plaintiffs' civil rights, as required for a § 1983 claim against a local government by <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 694 (1978). Nor do we find any policy or custom of Delaware County that was the "moving force" behind any of the plaintiffs' complaints. <u>Id.</u> Accordingly, Delaware County cannot be held liable under § 1983. In any event, even if Delaware County had such a policy or custom, it was not involved in any of the actions taken against plaintiffs. The code violation citations and parking tickets were issued by Lansdowne Borough. The hearings related to the citations were in

---

4. Plaintiffs filed no response to this motion.

-13-

the magisterial district court, and bench warrants and bail decisions were issued by magisterial district judges.

Delaware County is not liable for any actions of the magisterial district judges. Magisterial district courts and judges, while located in Delaware County, are part of the unified judicial system of the Commonwealth of Pennsylvania. See 42 Pa. Cons. Stat. Ann. § 301. "All courts and agencies of the unified judicial system, including the Philadelphia Municipal Court, are part of 'Commonwealth government' and thus are state rather than local agencies. Callahan v. City of Philadelphia, 207 F.3d 668, 672 (3d Cir. 2000) (citing Pa. Const. art. V, § 6(c); 42 Pa. Cons. Stat. Ann. § 102; 42 Pa. Cons. Stat. § 301).

Finally, Delaware County is not responsible for any claim arising out of events that occurred at George Hill where Miles was incarcerated for several days. Control of jails and county prisons in Delaware County is vested in the Delaware County Board of Prison Inspectors, which has entered into a contract with a private corporation, the GEO Group, Inc., to operate them. See, e.g., Morgan-Mapp v. George W. Hill Corr. Facility, No. 07-2949, 2008 U.S. Dist. LEXIS 69434 (E.D. Pa. Sept. 12, 2008). While Miles may have suffered injuries while in prison, Delaware County is not the proper party to be sued for any such injuries.

For these reasons, we will grant the motion of Delaware County for summary judgment on the claims under § 1983 and enter judgment in its favor and against the plaintiffs.

IV.

We now turn to the motion for summary judgment of the remaining defendants, Gould, Jozwiak, Kortan, and the Borough. Their motion contends that: (1) plaintiffs have no evidence of a custom or policy of Lansdowne Borough that caused a constitutional violation; (2) plaintiffs have no evidence of a violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"); (3) plaintiffs' claims are barred, in part, by the applicable statute of limitations; (4) plaintiffs have no evidence to support any cognizable state law claims; and (5) Gould, Jozwiak, and Kortan have qualified immunity.

We will first address the RLUIPA claims against these defendants. In relevant part, the statute provides:

> (1) Equal terms. No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.
> (2) Nondiscrimination. No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.
> (3) Exclusions and limits. No government shall impose or implement a land use regulation that--
> (A) totally excludes religious assemblies from a jurisdiction; or
> (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

42 U.S.C. § 2000cc.

Plaintiffs do not cite which part of the statute has been violated. Nonetheless, they appear to be making an "equal terms" claim that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly

or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc. The Second Amended Complaint states that the Ministry was "subjected to unequal treatment by defendants because of plaintiff's status as a church." To assert a claim under this provision, a plaintiff "must show (1) it is a religious assembly or institution, (2) subject to a land use regulation, which regulation (3) treats the religious assembly on less than equal terms with (4) a nonreligious assembly or institution (5) that causes no lesser harm to the interests the regulation seeks to advance." Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch, 510 F.3d 253, 270 (3d Cir. 2007).

In support of their RLUIPA claim, the plaintiffs have provided some evidence that the Ministry was denied a zoning permit because it was a church. As discussed above, Miles testified that Travers told her that if the Ministry was going to conduct religious activities of any kind at the property, it would be in violation of the Borough's zoning code. In addition, Linda Postell, a member of the Ministry, testified that she attended a zoning appeal board hearing where the Ministry's zoning permit application was denied. She explained, "it was our opinion it was because there was going to be a church in the building and they had restricted any other churches from coming into the area." At her deposition, Mia L. McMillan, another Ministry member, stated, "[a]t the zoning board, they said they didn't want another church in the area.... They decided they had

-16-

had enough churches.  They didn't want any other churches."
Further, Travers, the Borough's zoning officer, confirmed that 50
East Baltimore Avenue was in a "C-2 district," which meant the
property was prohibited from being used as a "church, synagogue,
mosque and other houses of worship."  No other evidence about the
Borough's zoning decisions regarding the Ministry, such as
minutes from zoning board meetings or the zoning code itself, has
been produced.  It is not clear when the zoning board meeting in
issue was held or whether the decision was appealed or whether a
zoning variance was requested and denied.

Our Court of Appeals has held that "the Equal Terms
provision does in fact require ... a secular comparator that is
similarly situated as to the regulatory purpose of the regulation
in question."  Lighthouse, 510 F.3d at 264.  Thus, it is not
sufficient for a RLUIPA claim to establish that religious
institutions are prohibited in a certain area under a zoning
code.  Id.  There must be some evidence, for example, that
nonreligious assemblies were permitted but religious assemblies
were not.  That said, our Court of Appeals explained that there
is "no need, ... for the religious institution to show that there
exists a secular comparator that performs the same functions" but
rather, what is needed is for the religious organization to
establish that the regulation in issue "treats religious
assemblies or institutions less well than secular assemblies or
institutions that are similarly situated as to the regulatory
purpose."  Id. at 266 (emphasis in original).  Accordingly,

courts must analyze the purposes of any applicable zoning regulations and whether religious and secular institutions are treated equally in order to satisfy these purposes. Here we are faced with a situation in which the plaintiffs have not produced any evidence of the specific zoning regulation to which they object. Nor have they identified any secular assembly that was treated more favorably by the defendants.

In their Second Amended Complaint, plaintiffs do claim, "defendants issued a variance for at least one other non-church business permitting them to engage in activities within the zoning district which required a larger assembly of people than the small congregation of the Ministry." However, this is all the plaintiffs say on this topic, and they never produced any evidence, not even the name, of this "non-church business." When Miles was asked to identify this business during her deposition, she was unable to do so. This is not sufficient evidence of a "secular comparator."

Although the plaintiffs have provided no "secular comparator" which was issued a zoning variance for a nonreligious assembly, they have come forward with evidence about an individual they allege was treated better than Miles with regard to the property code citations. As discussed above, an individual named Fred Farbman ("Farbman") received a number of property code citations but was never arrested or imprisoned because of them. The plaintiffs argue that this is evidence that they were treated unfairly by the Borough and its employees

because they were a religious organization and its leader.  We disagree.  First, Farbman owned an apartment building, not an assembly hall.  In addition, he came to an agreement with the Borough to comply with the code so that the citations would be dropped.  The plaintiffs have produced no evidence they they tried to come to such an agreement with the Borough.  Nor is there anything in the record to show that Farbman failed to respond to the citations or that bench warrants were issued against him.  The facts of Farbman's case simply are not similar enough to the plaintiffs' be a "secular comparator" to warrant an "equal terms" violation.  Moreover, the plaintiffs have not shown that the Borough had any regulation that treated religious assemblies or institutions less favorably than secular assemblies or institutions.

In addition to the equal terms violation, the plaintiffs appear to contend that a RLUIPA violation occurred because the Borough intimidated their contractors because the Ministry was a religious organization.  We assume this claim fits under the second portion of the statute:  "Nondiscrimination.  No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination."  42 U.S.C. § 2000cc.  The only evidence of possible intimidation on the record is Miles' testimony in her deposition.  She stated that code enforcement office agents observed the work the roofing contractor Summerfield was doing on the property at 50 East Baltimore

Avenue, said they were not satisfied that he could do the job, and stopped his work. On the other hand, both Summerfield and Cooper, the other roofing contractor hired to perform work on the roof on that property, testified that they stopped working for the plaintiffs because of concerns about not being paid, not because they felt intimidated by the Borough or its employees. Miles' testimony is not sufficient to create a genuine dispute as to any material fact on the issue of discrimination under RLUIPA.

The third provision of RLUIPA provides: "Exclusions and limits. No government shall impose or implement a land use regulation that -- (A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." There is no evidence that Lansdowne Borough imposed or implemented a land use regulation that totally excludes religious assemblies from its borders or unreasonably limited religious assemblies, institutions, or structures within it. In fact, we know from the record that Miles was the pastor of the Children's Bread Church, located within the Borough. Accordingly, any "exclusions and limits" claims against Gould, Jozwiak, Kortan, and the Borough under RLUIPA fails.

We will next address the § 1983 claims against Gould, Jozwiak, Kortan, and the Borough. Section 1983 provides that:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of
> any State subjects, or causes to be
> subjected, any citizen of the United States
> or other person within the jurisdiction

thereof to the deprivation of any rights,
privileges, or immunities secured by the
Constitution and laws, shall be liable to the
party injured.

In Count I, Miles avers that defendants Gould, Jozwiak,
Kortan, and the Borough violated her due process rights by
incarcerating her in March 2009 without due process of law.  In
Count II, she claims that these same defendants as well as
Delaware County violated her due process rights by holding Miles
personally liable for debts and fines imposed by the defendants
upon the Ministry.

As noted above, Gould was the Borough's senior code
enforcement officer, Jozwiak was the Borough's director of zoning
and code enforcement, and Kortan was the Borough's chief of
police.  Gould and Jozwiak simply were responsible for issuing
the various citations against Miles.  Kortan's only action
leading up to this litigation was his statement to Mugler that
Miles had outstanding bench warrants for code violations and
parking tickets and was currently in the Borough's Municipal
Building.  Mugler, who is not a party in this action, then
arrested her on the warrants.

Gould, Jozwiak, and Kortan contend that they are
entitled to summary judgment based on qualified immunity.[5]  This
doctrine protects government officials "from liability for civil
damages insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a

_____

5.  The plaintiffs did not respond to this argument.

-21-

reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Because qualified immunity applies only to constitutional and statutory evaluations and we have already determined that there is not enough evidence for the plaintiffs' RLUIPA claim to go forward, we will address it only with regard to the § 1983 claims against the individual defendants.

Qualified immunity protects a government official who "made a reasonable mistake about the legal constraints" on his or her actions. <u>Curley v. Klem</u>, 499 F.3d 199, 206-07 (3d Cir. 2007) (internal quotations and citations omitted). There is a two-part inquiry in making a qualified immunity determination. We must ask whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" <u>Scott v. Harris</u>, 550 U.S. 372, 377 (2007) (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)). We must also inquire "whether the right was clearly established ... in light of the specific context of the case." <u>Id.</u> Unless both questions are answered in the affirmative, the defendants are entitled to qualified immunity. "Where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right." <u>Sherwood v. Mulvihill</u>, 113 F.3d 396, 399 (3d Cir. N.J. 1997) (citations omitted).

Gould, Jozwiak, and Kortan are entitled to qualified immunity for their actions because the plaintiffs have failed to set forth any facts to show that the individual defendants' actions violated plaintiff's constitutional rights. As discussed above, Miles alleges two due process violations: first, that she was incarcerated without due process and, second, that Gould and Jozwiak violated her due process rights by issuing many citations in her name instead of in the Ministry's.

In order to establish a procedural due process violation, the court must employ the "familiar two-stage analysis," inquiring (1) whether "the asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,'"; and (2) whether the procedures available provided the plaintiff with "due process of law." Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000) (quoting Robb v. City of Philadelphia, 733 F.2d 286, 292 (3d Cir. 1984)). The basic requirements of procedural due process are notice and an opportunity to be heard before a person is deprived of a protected interest. Wilson v. MVM, 475 F.3d 166, 177-78 (3d Cir. 2007). "In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." Alvin, 227 F.3d at 116.

We will first address Miles' claim that the defendants violated her due process rights by issuing citations in her name instead of in the Ministry's. Miles had signed her name as

"equitable owner or lessee" of 50 East Baltimore Avenue on documents filed with the Borough. As a result, it was reasonable for the defendants to assume she was responsible for the condition of the property. They are protected by qualified immunity for any "reasonable mistake" in this regard. See Curley, 499 F.3d 199 at 206-07. Moreover, Miles did not take advantage of the processes available to her after the citations were issued. She failed to respond to the notices and summons sent to her on the building code violations and did not attend any of the scheduled hearings. If she had appeared at these hearings, she could have argued that she was not the proper party on the citations.[6] Her failure to do so was not the responsibility of the defendants.

As for Miles' due process claim regarding her incarceration, Gould, Jozwiak, and Kortan were not the parties responsible for Miles' imprisonment and thus did not violate her due process rights in this regard. Miles contends that they should have permitted her to pay the individual fines themselves on the day of her arrest rather than the $2,000 bail. However, she provides no evidence that this was the decision of these

_____

6. In her opposition brief, Miles also contends that obtaining a use and occupancy certificate should have been the responsibility of the Barksdales, who were the prior owners of 50 East Baltimore Avenue, rather than the responsibility of the Ministry. It is undisputed that the applicable section of the Borough's code was adopted after the Barksdales bought the property and that there had been no previous requirement to have a certificate of occupancy. Nevertheless, if Miles had appeared at the scheduled hearings, she also could have made her argument in this regard.

defendants.  Only the magisterial district court judge who
incarcerated her would be responsible for the decision to do so,
and he is not a party to this action.

Miles' § 1983 claims against the Borough also fail.  To
bring a § 1983 claim against a local government, a plaintiff must
identify a "policy" or "custom" of that government that was the
"moving force" behind the injury.  See Monell v. Dep't of Soc.
Servs., 436 U.S. 658, 694 (1978); see also Bd. of Comm'rs of
Bryan Cnty. v. Brown, 520 U.S. 397, 400 (1997).  Miles has not
done so here.

Although incarcerating Miles for failure to pay the
fines on the citations and parking tickets may have been overly
harsh, we reiterate that there is no evidence that anyone other
than the magisterial district judge was responsible for her
incarceration.  The Borough, who was not his employer, certainly
cannot be held responsible under Monell for his conduct.  The
plaintiffs have pointed to no policy or practice of Lansdowne
Borough for incarcerating individuals without due process.  The
plaintiffs have also not identified any policy or custom that
caused the debts and fines to be imposed improperly against her
personally and not against the Ministry.  The only policies on
which the plaintiffs seem to rely are, first, that the Borough's
code allowed Gould and Jozwiak to impose multiple citations for
the same violation, if it was not cured within 24 hours and,
second, that officers were entitled to present all outstanding
citations to a magisterial district judge responsible for setting

bail, including those which are not the subject of any bench warrant. These policies were not the "moving force" behind any constitutional violation, as required under § 1983. See Monell, 436 U.S. at 694.

V.

The plaintiffs' Second Amended Complaint also contains supplemental state law claims for abuse of process, malicious prosecution, and false arrest against all the defendants. We may decline to exercise jurisdiction over supplemental state court claims under 28 U.S.C. § 1367(c)(3) where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); see also Borough of West Miffflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995) (citing United Mine Workers v. Gibbs, 383 U.S. 715, 726-27 (1996)). Since we are granting summary judgment in favor of all the defendants on all the federal claims, we see no compelling reason to proceed further with the state law claims and decline to do so.

VI.

In sum, we will grant both motions of the defendants for summary judgment and enter judgment in favor of the defendants and against the plaintiffs on the § 1983 and RLUIPA claims. We will also dismiss the supplemental state law claims without prejudice.